IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

          Vs.                                            No.  11-2251-SAC

ROBERT D. ORR, LELAND G. ORR,
MICHAEL S. LOWRY, MICHAEL S.
HESS, KYLE L. GARST, and
TRAVIS W. VRBAS,

                              Defendants.


MEMORANDUM AND ORDER

          The Securities and Exchange Commission ("SEC") filed this

enforcement action in May of 2011, alleging "massive financial fraud" by

"former senior management of Brooke Corporation . . . and its publicly-

traded subsidiaries, Brooke Capital Corporation ("Brooke Capital"), an

insurance agency franchiser, and Aleritas Capital Corporation ("Aleritas"), a

finance company specializing in providing loans to Brooke franchisees."  (Dk.

1, ¶ 1).  The SEC's 56-page complaint contains more than 200 paragraphs of

allegations that lay out more than 15 differently titled sections of

misrepresentations and misconduct.  On July 13, 2011, the court signed and

filed judgments of permanent injunctions against the defendants, Robert D.

Orr and Leland G. Orr, with their consent.  (Dks. 18 and 20).  In those

judgments, the defendants agreed they would pay disgorgement and civil

penalties in the amounts determined by the court upon the SEC's motion. The SEC has filed its motion for final judgment as to disgorgement and penalties against the defendants.  (Dk. 30).  In response, the Orrs have filed separate lengthy responses with voluminous exhibits in support.  (Dks. 35, 38, 40).  This case was recently assigned to this chambers, and it is ripe for decision.

**PROCEDURAL POSTURE**

As provided in the consent judgments, the defendants agree they "shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]."  (Dk. 18, § VIII; Dk. 20, § IX).  In particular, the parties agree:

> In connection with the Commission's motion for disgorgement and civil penalties, and at any hearing held on such a motion:  (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint;  (b) Defendant may not challenge the validity of the Consent or this Judgment;  (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court:  and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.

(Dk. 18, § VIII; Dk. 20, § IX). Their Consents filed with the court show the defendants also agree:

> Defendant further agrees that the amounts of the disgorgement and

2

civil penalty shall be determined by the Court at a hearing upon motion of the Commission.  In connection with the Commission's motion for disgorgement and civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

     6.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

     7.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Judgment.

     . . . .

     9.    Defendant agrees that this Consent shall be incorporated into the Judgment with the same force and effect as if fully set forth therein.

(Dk. 10, pp. 4-5; Dk. 11, pp. 4-5).  The Judgments and Consents refer to the possibility of a hearing as part of the determination process.  Even so, the parties' filings do not request a hearing or even suggest they have reserved any arguments or evidence for such a hearing.  The Orrs have filed bound volumes and notebooks of exhibits in support of their lengthy and detailed arguments, and they have not suggested there is more evidence or testimony to be presented at any hearing.  The fair impression is that the parties regard the existing record as complete with all essential evidence and relevant argument before the court.  Considering the filings already made, the court believes any additional evidence or argument would likely be repetitive and unnecessary.  To insure the Orrs a full opportunity to present their position, the court hereby vacates the order denying their motion for leave to file surreply (Dk. 47) and grants their motion (Dk. 46).  The court has read and considered the surreply attached to the Orrs' motion.  On the

balance of these circumstances, the court exercises its discretion against holding a hearing as not required and unnecessary.  *See SEC v. Smyth*, 420 F.3d 1225, 1232-33 (11th Cir. 2005).

**FACTS**

By reason of the Consents and Judgments, the court accepts the allegations in the Complaint as true.  The Orrs devote much space in the lengthy filings to disputing the accuracy, completeness and truthfulness of the complaint's allegations.  Their efforts are largely "irrelevant" because of their agreement.  *See SEC v. Integrity Financial AZ, LLC,* 2012 WL 176228 at *2 (N.D. Ohio 2012).  They may not litigate those allegations as if there is no agreement, and they are precluded from arguing they did not violate the federal securities laws as alleged in the complaint:

> Thus, although he began this litigation with the right to have a trial at which the Court would hear witnesses and decide the relevant facts, including drawing any reasonable inferences and assessing culpability, he relinquished that right when he chose . . . [to] settle the case on terms that explicitly avoided trial, and when he agreed that, for purposes of this motion, the Court would treat the allegations in the complaint as proven.

*U.S. SEC. v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 558 n.2 (S.D.N.Y. 2009), *aff'd*, 438 Fed. Appx. 23 (2nd Cir. 2011).  The Orrs are effectively "barred by the terms of their agreements from challenging or otherwise contesting the truth of the allegations of the complaint in this disgorgement proceeding."  *SEC v. Silverman*, 328 Fed. Appx. 601, 604 (11th Cir. 2009).

4

"By entering into a consent decree, the 'parties waive their right to litigate the issues involved in the case . . . .'"  *Blakely v. United States*, 276 F.3d 853, 867-868 (6th Cir. 2002) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).

Rather than discussing every instance when the Oars pursue a challenge precluded by their agreement, the court will discuss only as examples some of those instances and reveal them as flawed and waived. The Orrs argue the court should discount any of the complaint's allegations that were not alleged specifically in the Wells letter.[1]  The Orrs complain that they settled this matter in reliance on the Wells letter and that the SEC in including more damaging allegations in the complaint and in not including

---

[1] "'A Wells Notice notifies the recipient that the SEC's Enforcement Division is close to recommending to the full Commission an action against the recipient and provides the recipient the opportunity to set forth his version of the law or facts.'"  *SEC v. Internet Solutions for Bus., Inc.*, 509 F.3d 1161, 1163 n. 1 (9th Cir. 2007) (quoting *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 279 (D. Conn. 2005)).  While arguing that the allegations in the Wells letter should constrain the SEC from alleging any additional facts in the complaint, the Orrs cite no legal authority for this proposition.  Nothing that the Orrs argue shows the function and purpose of a Wells Notice necessarily restrict what details can be alleged in the subsequent complaint. As for the notion that they were "blindsided" by the complaint's allegations of improper intent, the Orrs overlook that the SEC's Well letter described the recommended action as alleging violations of § 17(a) of the Securities Act of 1933 and of § 10(b) of the Securities Exchange Act of 1934, both of which include the element of scienter.  *See SEC v. Wolfson*, 539 F.3d 1249, 1256-57 (10th Cir. 2008) (element of scienter common to § 10(b) and § 17(a)(1)).

exculpatory allegations failed to act with honesty and impartiality.[2]   The Orrs

have no legal authority for now being relieved from their consent and the

specific allegations of the complaint.   That the Orrs assert they relied on the

Wells letters, rather than the complaint, in settling this case is contradicted

by the plain and express terms of their consent agreements and the

judgments based on the same.   The consent agreements provide that the

defendants entered them "voluntarily" and without any "threats, offers,

promises, or inducements of any kind" by the SEC.   (Dk. 10, ¶ 8; Dk. 11, ¶

8).   As far as the SEC's motion for disgorgement and civil penalties, the

consents provide that the defendants are "precluded from arguing that . . .

[they] did not violate the federal securities laws as alleged in the

Complaint;" and that they "may not challenge the validity" of the consents

or judgments.   (Consents, Dk. 10, ¶ 5; Dk. 11, ¶ 5); (Judgments, Dk. 18, p.

6; Dk. 20, p. 6).   Finally, the consents provided:

> 13.   Defendant understands and agrees to comply with the
> Commission's policy "not to permit a defendant or respondent to
> consent to a judgment or order that imposes a sanction while denying

---

[2] Orr's citation of *SEC v. Heartland Advisors, Inc.*, 2006 WL 2547090 at *5, n.4 (E.D. Wis. 2006), is not relevant to his argument.   The court there likened the SEC's interest in an enforcement action to the government in a criminal prosecution whose overriding interest is that justice is done rather than a case is won.   *Id*.   The context for that comment was that in summary judgment pleadings, the SEC had played "fast and loose with the facts" and failed "to quote authorities accurately."   *Id*.   The Orrs have not alleged any improper conduct of comparable character and what they do allege as improper takes a position undermined by what they have admitted and waived in their consents.

> the allegations in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint.

*Id.* at ¶ 13. The consent agreements, as incorporated into the judgment, establish the Orrs voluntarily waived all arguments challenging the validity of their consent or factual basis of their violations as allegations in the complaint. The Orrs offer no cogent argument for relieving them from these express terms so that they can now enjoy the benefits of their consent judgments but still discount or dispute any allegation in the complaint. The plain and unambiguous terms of the signed and voluntary consents dispel any argument of overreaching or procedural unfairness here.[3]

Robert Orr asserts a lack of candor in the SEC's press release and the failure to include in the complaint certain regulatory and legal information exculpatory to him. He offers no authority for SEC having this duty or for such a duty arising from the SEC's legal responsibilities in an enforcement action. Such information may be relevant to the penalty calculations, and the Orrs are certainly capable of presenting the same so long as they do not contradict or challenge the factual allegations of the

---

[3]The SEC notes the same detailed allegations were made against three other settling co-defendants "who agreed to similar sanctions, without comment or complaint." (Dk. 45, p. 9).

7

complaint.

Framing the 56-page complaint is this "Summary of the Case":

1.     This is an SEC enforcement action concerning a massive financial fraud conducted by the former senior management of Brooke Corporation, formerly headquartered in Overland Park, Kansas, and its publicly-traded subsidiaries, Brooke Capital Corporation ("Brooke Capital"), an insurance agency franchisor, and Aleritas Capital Corporation ("Aleritas"), a finance company specializing in providing loans to Brooke franchisees (Brooke Corporation, Brooke Capital, and Aleritas are collectively referred to as "the Brooke Companies").

2.     In SEC filings and other public statements for year-end 2007 and the first and second quarters of 2008, the Defendants misrepresented the health of Brooke Capital's franchise business, Aleritas' loan portfolio, and the increasingly dire liquidity and financial condition of the Brooke Companies.

3.     Brooke Capital's management, Defendants Robert Orr, Leland Orr, Garst, and Vrbas, misrepresented two critical elements of the company's franchising business - the total number of franchise locations, and the financial health of their franchisees.  Specifically, they inflated the number of franchise locations by including failed and abandoned locations in totals. They also concealed the nature and extent of Brooke Capital's financial assistance to its franchisees, which included making franchise loan payments to Aleritas on behalf of struggling franchisees.

4.     By 2008, Brooke Capital's financial assistance to franchisees was so burdensome that Robert Orr and Leland Orr engaged in various undisclosed schemes to meet almost weekly liquidity crises.  Among other things, they secretly borrowed funds received from insurance customers of Brooke Capital's franchisees that were supposed to be held by Brooke Capital in trust for payment of insurance premiums to independent third-party insurance companies. They also hid Brooke Capital's inability to timely pay funds owed to profitable franchisees and other Brooke Capital creditors.  Robert Orr, Leland Orr, Hess, and Vrbas also misstated Brooke Capital's financial results by improperly recognizing fee revenue on loans by a Brooke Capital subsidiary, when in fact the loans had not been fully funded. In addition, Leland Orr caused Brooke Capital's failure to write off or expense uncollectable amounts owed to Brooke Capital by its many failed franchisees.

5.     Management at Aleritas, Robert Orr, Leland Orr, Lowry,

8

and Hess, concealed huge gaps in the company's funding that severely restricted its ability to originate new loans. They misrepresented that the company had successfully refinanced its primary working capital debt facility.  They also hid the company's inability to repurchase millions of dollars of short-term loans sold to its network of regional lenders.

6.      As the liquidity of Aleritas became more desperate, Lowry sold or pledged the same loans as collateral to more than one lender. As a loan servicer, Aleritas also received payments from borrowers that it was obligated to promptly remit to lenders that owned the underlying loans.  However, Robert Orr, Leland Orr, Lowry, and Hess diverted these borrower payments to cover Aleritas' operating expenses.  Robert Orr, Leland Orr, Lowry, and Hess also concealed the rapid deterioration of Aleritas' loan portfolio by falsifying loan performance reports to lenders, understating loan loss reserves, and by failing to write-down Aleritas' residual interests in securitization and credit facility assets.

7.      The scheme collapsed in September 2008 when Aleritas' lenders and securitization investors filed a lawsuit to halt the Brooke Companies' diversion of borrower payments for operating expenses and succeeded in petitioning the Court to put the Brooke Companies under the control of a special master.  In October 2008, Brooke Corporation and Brooke Capital declared Chapter 11 bankruptcy and suspended most of their operations.  Aleritas did not file bankruptcy but instead ceased all operations and transferred its loan servicing duties directly to its lenders and securitization trustees.  The Brooke Companies were unable to reorganize in bankruptcy, and therefore in June 2009, the proceedings were converted to liquidation under Chapter 7 of the bankruptcy code.

8.      The rapid collapse of the Brooke Companies had a devastating regional impact. With the cessation of bookkeeping and other centralized operations of Brooke Capital, hundreds of its franchisees failed.  Because Brooke Capital franchisees had few, if any, tangible assets other than profits from their ongoing operations, lenders and securitization investors holding franchisee loans originated by Aleritas suffered losses totaling hundreds of millions of dollars. Primarily as a result of losses suffered on Aleritas loans, several regional banks failed.  One of Aleritas' largest lenders obtained funds from the U.S. Department of the Treasury under the Troubled Asset Relief Program.

(Dk. 1).  As far as the details alleged in the other 160 paragraphs of the

complaint, the court incorporates them by reference as the findings of fact for purposes of this order.  As material to its conclusions that follow, the court will highlight those findings of fact and discuss the defendant's arguments and evidence.

**DISGORGEMENT**

As stated before, the defendants have agreed to "pay disgorgement of ill-gotten gains, . . . pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]."  (Dk. 18, § VIII; Dk. 20, § IX).  The SEC seeks only the money that Robert and Leland Orr took from BHI that in turn came from Brooke Corporation during the time of illegal activities.  Under the section entitled, "Personal Profit of Defendants Robert Orr, Leland Orr, and Lowry," the complaint alleges the following at ¶ 166:

> From the fourth quarter of 2007 until Brooke Corporation filed for bankruptcy in October 2008, Brooke Corporation made dividend payments and other cash transfers to BHI, the Orr's' (sic) holding company, totaling more than $4.5 million dollars.  From the fourth quarter of 2007 until Brooke Corporation filed for bankruptcy in October 2008, Robert Orr received at least $771,147.27, and Leland Orr received at least $270,000, in dividends and other payments from Brooke Holdings, Inc.  During this time period, Robert Orr and Leland Orr knew that the Brooke Companies' financial condition had been materially misstated in the 2007 Forms 10-K for Brooke Capital and Brooke Corporation, the first and second quarter 2008 Forms 10-Q for Brooke Capital, Aleritas, and Brooke Corporation, and other public statements as alleged herein.

(Dk. 1, ¶ 166).  The SEC asserts Brooke Corporation's dividend payments

and other payments to BHI are causally connected to the material misstatements about Brooke Companies' financial condition in 2007 and 2008 SEC filings and other public statements alleged in the complaint.  Thus, the "SEC simply seeks disgorgement of monies the Orr brothers took from the Brooke Companies during the time they were defrauding the investing public."  (Dk. 45, p. 2).

   "Disgorgement is by nature an equitable remedy as to which a trial court is vested with broad discretionary powers." *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006) (internal quotation marks and citations omitted), *cert. denied*, 550 U.S. 905 (2007).  The purposes of disgorgement are to deprive wrongdoers of their ill-gotten gains and to deter violations by "making illegal activity unprofitable."  *U.S. v. Rx Depot, Inc.*, 438 F.3d 1052, 1061 (10th Cir.) (citations omitted), *cert. denied*, 549 U.S. 817 (2006); *see SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1113 (9th Cir. 2006).  Thus, "the power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (internal quotation marks and citation omitted).  Only profits "causally connected to the violation" are subject to disgorgement.  *Maxxon, Inc.*, 465 F.3d at 1179 (internal quotation marks and citations omitted).

11

A district court enjoys "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474, 1475 (2nd Cir. 1996) (citation omitted), *cert. denied*, 522 U.S. 812 (1997). The remedy of disgorgement "consists of factfinding by a district court to determine the amount of money acquired through wrongdoing . . . and an order compelling the wrongdoer to pay that amount plus interest to the court." *SEC v. Cavanagh*, 445 F.3d 105, 116 (2nd Cir. 2006). Disgorgement is used "to prevent wrongdoers from unjustly enriching themselves through violations." *SEC v. DiBella*, 587 F.3d 553, 572 (2nd Cir. 2009) (internal quotation marks and citation omitted). "[T]he amount of disgorgement should include all gains flowing from the illegal activities." *JT Wallenbrock*, 440 F.3d at 1114 (internal quotation marks and citation omitted).

"The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal quotation marks and citations omitted). "Disgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. Patel*, 61 F.3d 137, 139 (2nd Cir. 1995) (internal quotation marks and citations omitted).  Once a reasonable

approximation is shown, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.*; *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). "Exactitude is not a requirement; [s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Calvo*, 378 F.3d at 1217 (internal quotation marks and citations omitted).

The Orrs contend there are no ill-gotten gains to disgorge arguing first that during this period BHI received from Brooke Corporation only payments on authorized loans for which BHI had released collateral that Brooke Corporation then could pledge to other lenders. They cite their lengthy subpoena response to the SEC dated October 31, 2010, (L. Orr, Dk. 35, Ex. 44; R. Orr, Dk. 40, Ex. 4), as clearly demonstrating "that all amounts received by Orr's family company" were loan payments by Brooke Corporation. (L. Orr Resp. Dk. 35, p. 73; R. Orr Resp. Dk. 40, p. 82). This position is contrary to ¶ 166 of the complaint that alleges "[f]rom the fourth quarter of 2007 until Brooke Corporation filed for bankruptcy in October 2008, Brooke Corporation made <u>dividend payments</u> and other cash transfers to BHI." (Dk. 1, ¶ 166) (underlining added). The Orrs are precluded from arguing and have not shown from their subpoena response that all "$4.5 million dollars" coming from Brooke Corporation to BHI were loan payments.

The court has found records in that subpoena response indicating that BHI deposited over $1,080,000 in February of 2008 and described those deposits as "dividends" from "BC." As the complaint alleges violations that includes misrepresentations and omissions resulting in overstated earnings and understated losses, Brooke Corporation's dividend payments are causally connected to the securities violations. What the SEC seeks to disgorge from the Orrs is less than $1,080,000 and represents that what the Orrs withdrew are, "funds that otherwise would have been available for other of the Brooke Companies investors and creditors." (Dk. 45, p. 3, n.2). These findings are consistent with the complaint's allegations entitled "Personal Profit of Defendants Robert Orr, Leland Orr, and Lowry."

At ¶¶ 166 and 167, the complaint alleges a period of personal profit from the fourth quarter of 2007 until October of 2008. Accepting the these allegations as true by reason of the consent judgment, the court rejects the defendants' tenuous arguments for narrowing the period of disgorgement from March 17, 2008, to August 20, 2008. The complaint is replete with allegations of misrepresentations made on the year-end 2007 and first quarter 2008 SEC filings including an overstatement of year-end net income and with allegations of failing to record transactions and causing financial statements to not be prepared in conformity with GAAP during the same period. (¶¶ 155-157). The allegations of the complaint are not

14

susceptible to a reading that the Orrs' violations occurred only within a narrower period based on either actual filing dates or their express assumption of certain responsibilities.  The court agrees with the government that the defendants' culpability is not confined to the SEC filing dates but necessarily extends to the periods covered by those filings and the accounting practices.  The complaint alleges violations based on the defendants' ongoing knowledge of the facts and their complicity in not truthfully disclosing the same.  The complaint certainly alleges that this began in late 2007 with Brooke Capital being "inundated with failing startup locations." (¶ 45).  Moreover, the consent judgments provide that "[p]rejudgment interest shall be calculated from October 1, 2007."  (Dk. 18, p. 6; Dk. 20, p. 6).  As another court recently recognized, "[f]or prejudgment interest to be calculated from that date, so, too, must the disgorgement amount.  Thus, implicit in these consent orders are Defendants' concessions that the disgorgement amount be calculated from February 16, 2006, as well."  *SEC v. Hedgelender LLC*, 786 F. Supp. 2d 1365, 1371 (S.D. Ohio 2011).

Instead of for their personal gain, the Orrs say their withdrawals from BHI were used in part to pay taxes on behalf of their family's company income.  (L. Orr Resp. Dk. 35, p. 73; R. Orr Resp. Dk. 40, p. 82).  This argument is to no avail.  "[T]he cases overwhelmingly hold that how a

defendant chooses to spend his ill-gotten gains, whether it be for business expenses, personal use, or otherwise is immaterial to disgorgement." *SEC v. Aerokinetic Energy Corp.*, 444 Fed. Appx. 382, 385 (11th Cir. 2011); *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d at 564 ("irrelevant for disgorgement purposes" that the defendant disposed of ill-gotten gains through "subsequent investment of these funds, payments to charities, and/or payment to co-conspirators" as none are "deductible" from disgorgement amounts). "The manner in which [the defendant] chose to spend the illegally obtained funds has no relevance to the disgorgement calculation." *SEC v. Platforms Wireless Intern. Corp.*, 617 F.3d at 1097-98 (internal quotations marks and citation omitted). That the defendants used some or all of the proceeds to pay business taxes or other business expenses does not make them deductible from their gross ill-gotten gains subject to disgorgement. *See SEC v. Verdiramo*, 2011 WL 5546222 at *3 (S.D.N.Y. 2011).

The defendants seek a reduction or offset based on the value of collateral released by BHI, their personal guarantees, the subsequent personal judgments against them, and the legal fees incurred as officers and directors of Brooke Corporation in dealing with the failed Brooke Capital and Aleritas. Some courts "deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the

16

wrongdoer's actual profit, . . . , but they have taken care to distinguish such costs from general business expenses, such as overhead expenses, which should not reduce the disgorgement amount." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d at 564.  Even so, the courts have held, however, "that intentional wrongdoers are generally denied any offsets." *SEC v. Hedgelender LLC*, 786 F. Supp. 2d at 1371 (citations omitted). Disgorgement is not reduced by a defendant's own investment losses in the operation.  *SEC v. Integrity Financial AZ, LLC*, 2012 WL 176228 at *7 (N.D. Ohio 2012); *See SEC v. Seghers*, 298 Fed. Appx. 319, 336, 2008 WL 4726248 at *14 (5th Cir. 2008) ("Any profits that Seghers obtained by wrongdoing are ill-gotten gains whether he retained them or lost them in the Integral Funds or another investment.").  Because the Orrs offer no evidence demonstrating these fees and expenses constitute a direct transaction cost, they are irrelevant in arriving at the appropriate amount of disgorgement.

The court grants the SEC's motion to impose final judgment requiring Robert Orr to pay disgorgement in the amount of $771,147 and requiring Leland Orr to pay disgorgement in the amount of $270,000.

**PREJUDGMENT INTEREST**

Committed to the court's sound discretion, an award of prejudgment interest "prevents a defendant from benefitting from what amounts to an interest-free loan." *SEC v. Mantria Corp.*, 2011 WL 3439348

at *8 (D. Colo. Aug. 5, 2011) (citing *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007).  "Disgorgement normally includes prejudgment interest to insure that wrongdoers do not profit from their illegal conduct." *SEC v. Keating*, 2011 WL 1549429 at *2 (D. Utah 2011) (citation omitted). In this case, the judgments provide that, "[p]rejudgment interest shall be calculated from October 1, 2007, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."  (Dk. 18, p. 6; Dk. 20, p. 6).  "The Court should look to considerations of fairness and equity in determining whether to award prejudgment interest as well as the length of time the defendants retained the proceeds of the illicit transaction." *SEC v. Hedgelender*, 786 F. Supp. 2d at 1372 (internal quotation marks and citations omitted).  The allegations of scienter found in this complaint are "sufficient to justify an award of prejudgment interest" here.  *Id*.  Having consented to an award of prejudgment interest, the defendants are not properly positioned now to challenge the equities of awarding prejudgment interest.  The defendants have not challenged the government's calculation of the same.  The SEC's motion for final judgment requiring the Orrs to pay prejudgment interest is granted.

**PENALTY**

18

Both the Securities Act and the Exchange Act provide for civil penalties that a court may impose against the violator "upon a proper showing." *See* 15 U.S.C. §§ 77t(d) and 78u(d)(3). The Acts outline three tiers of penalty amounts or "the gross amount of pecuniary gain" to defendant with the upper tiers corresponding to culpability and loss. *Id.* The SEC seeks a third tier penalty reserved for a violation that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and" that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 14 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii). A second tier penalty does not require proof of a violation that results in a substantial loss or a risk of the same. 14 U.S.C. §§ 77t(d)(2)(B) and 78u(d)(3)(B)(ii). "Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d at 567 (citation omitted).

"A monetary penalty is designed to serve as a deterrent against securities law violations." *SEC v. Lybrand*, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), *aff'd*, 425 F.3d 143 (2nd Cir. 2005). "Such penalties are designed to deter future violations of the securities laws and thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'"

*SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d at 567 (quoting *SEC v.*
*Palmisano*, 135 F.3d 860, 866 (2d Cir.), *cert. denied*, 525 U.S. 1023 (1998)).
"[W]hereas disgorgement merely restores [the] defendant to his original
position without extracting a real penalty for his illegal behavior, . . . , the
imposition of civil penalties is appropriate to accomplish the goal of
punishment." *Id.* (internal quotation marks and citations omitted).  A court
may consider all of the following in deciding whether to impose a penalty
and, if so, in what amount:

> (1) the egregiousness of the violations at issue, (2) defendants'
> scienter, (3) the repeated nature of the violations, (4) defendants'
> failure to admit to their wrongdoing; (5) whether defendants' conduct
> created substantial losses or the risk of substantial losses to other
> persons; (6) defendant's lack of cooperation and honesty with
> authorities, if any; and (7) whether the penalty that would otherwise
> be appropriate should be reduced due to defendants' demonstrated
> current and future financial condition.

*SEC v. Merrill Scott & Assoc. Ltd.*, 2006 WL 3422106 at *4-*5 (D. Utah
2006) (quoting *Lybrand*, 281 F. Supp. 2d at 730); *see SEC v. Mantria Corp.*,
2011 WL 3439348 at *9 (quoting *SEC v. Huff*, 758 F. Supp. 2d 1288, 1363
(S.D. Fla. 2010), *aff'd*, ---Fed. Appx.--- (11th Cir. Jan. 3, 2012)).  "'The civil
penalty framework is of a discretionary nature and each case has its own
particular facts and circumstances which determine the appropriate penalty
to be imposed.'"  *SEC v. Elliott*, 2011 WL 3586454 at 13 (S.D.N.Y. 2011)
(quoting *SEC v. Haligiannis*, 470 F. Supp. 2d at 386); *see SEC v.*
*Hedgelender LLC*, 786 F. Supp. 2d at 1373.

20

Accepted as true, the allegations of the complaint are more than sufficient to establish that the Orrs violated securities laws with deceit and with a deliberate or reckless disregard of regulatory requirements.  Because the defendants also agreed they could not argue their actions did not violate the securities law as alleged in the complaint, this court will not recognize any argument running amiss of that agreement.  For example, the complaint alleges that the Orrs made or caused to make "public statements reporting continued robust sales of new franchises and commensurate growth in the total number of franchise locations" when they "knew or were reckless in not knowing, that . . . [the] public statements regarding the number of franchise locations were false and misleading because the totals included at least 150 startup locations that had failed and were no longer operating." (Dk. 1, ¶¶ 43 and 44).  The Orrs are now precluded from arguing that they did not violate the securities laws with a deliberate or reckless disregard but rather believed in "good faith" that their public statements were adequate and accurate having relied on others to compile the information.  The allegation of knowledge or recklessness in not knowing that the franchise numbers were false and misleading does not leave room for any such "good faith" denial of a violation.  Consequently, the court wholly and summarily rejects the defendants' efforts to re-characterize their particular violations as

otherwise good faith conduct.[4]

This is not to say that the court has not weighed and considered these same arguments insofar as they may bear generally on the factors of egregiousness and scienter.  In that regard, they are noteworthy for their consistency with the defendants' stated intentions for becoming more directly involved in the unfolding liquidity crises, for assuming responsibilities over these difficult situations without drawing any substantial salaries, and for risking most of their own monies and property when other corporate officers were jumping ship.  The defendants certainly made financial sacrifices,

_____

[4]For the record, the court has considered all the defendants' good faith arguments regarding the different alleged violations and reviewed much of the evidence offered in support of them.  Without notable exception, the court finds these arguments precluded by the terms of the consent judgment.  Here are several more examples.  The complaint alleges as a violation that the disclosure quoted at ¶ 51 on Brooke Capital's financial assistance to franchisees is false and misleading and that Orrs knew or were reckless in not knowing this.  The Orrs cannot now argue they believed in good faith the same disclosure to be adequate and accurate.  (Dk. 40, R. Orr, pp. 106-107; Dk. 35, L. Orr, pp. 45-48).  The complaint alleges as a violation that Orrs knowingly failed to disclose "Brooke Capital's materially decreasing liquidity and the company's misuse of funds to meet liquidity shortfalls."  (Dk. 1 ¶ 59).  This alleged violation precludes the defendants from contesting and arguing that they made a good faith effort at properly disclosing the liquidity problems and that they did not "misuse" funds.  (Dk. 40, R. Orr, pp. 108-110; Dk. 35, L. Orr, pp. 48-58).  At the end of 2007, the Orrs were aware of "improper revenue recognition" for fee revenue from loans that had not been fully funded by the end of the year which resulted in "false and misleading" 2007 Forms 10-K by Brooke Capital and Brooke Corporation.  (Dk. 1, ¶¶ 66, 73).  This alleged violation precludes the defendants from arguing and contesting that they made a "good faith" effort at "properly recording" and disclosing this as revenue at the end of 2007.  (Dk. 40, R. Orr, pp. 114-115; Dk. 35, L. Orr, p. 60).

personally and professionally, to assist Aleritas and Brooke Capital in the middle of these crises.  Even so, the plaintiff rightly argues that these so-called "good faith" efforts to deal with the financial problems and liquidity crises at Brooke Capital and Aleritas do not explain or justify the defendants' violations in concealing the problems and crises from the investing public.  At the same time, the defendants' submissions demonstrate that in many instances they did seek and receive some advice and assistance from other professionals.  The court is mindful of the defendants' arguments and evidence in this regard.

The imposition of a third-tier penalty here turns on whether the defendants' violations directly or indirectly resulted in substantial losses or in significant risks of substantial losses to others.  In its motion, the SEC cites ¶ 8 of the complaint in arguing that the court should impose third-tier penalties "because their [defendants'] conduct . . . resulted in losses totaling hundreds of millions of dollars . . . ."  (Dk. 31, p. 44).  This paragraph alleges:

> 8.    The rapid collapse of the Brooke Companies had a devastating regional impact.  With the cessation of bookkeeping and other centralized operations of Brooke Capital, hundreds of its franchisees failed.  Because Brooke Capital franchisees had few, if any, tangible assets other than profits from their ongoing operations, lenders and securitization investors holding franchisee loans originated by Aleritas suffered losses totaling hundreds of millions of dollars.  Primarily as a result of losses suffered on Aleritas loans, several regional banks failed.  One of Aleritas' largest lenders obtained funds from the U.S. Department of the Treasury under the Troubled Asset Relief Program.

(Dk. 1, ¶ 8).  While this paragraph certainly alleges that the failures of the

Brooke Companies had a "devastating regional impact,"  the court does not

read this paragraph also to allege that the defendants' violations resulted in

the companies' failures.   Indeed, the SEC's reply brief concedes as much:

"[t]he failures of the Brooke Companies are not, in and of themselves,

violative of the federal securities laws.  It is the concealing of the underlying

causes of those failures that violates the securities laws and harms

investors."    (Dk. 45, p. 11).  For that matter, the court is unable to read ¶ 8

to allege plainly that the defendants' violations caused the "rapidity" of the

Brooke Companies' collapse and that the "rapidity" of the collapse resulted in

the substantial losses.  The complaint simply does not allege sufficient facts

from which the court can find or conclude that the substantial losses argued

by the SEC were a result of the defendants' violations.  The court will not

impose third-tier penalties as requested in the plaintiff's motion.

          Looking at the other factors creates even more cause for

something much less than the significant penalties that the plaintiff suggests.

The complaint does allege numerous material misrepresentations and

omissions spanning three reporting periods that resulted in earnings being

overstated and in losses being understated.  The defendants agreed to a

consent judgment over the violations, but their most recent filings raise

questions over whether they have really admitted their wrongdoings.  In the

court's judgment, a significant mitigating factor is that in response to the

financial problems and liquidity crises, the defendants assumed responsibilities for the struggling corporations, committed more of their personal financial resources to the different ventures, and, as a result of the later corporate failures, they are now bankrupt and lack the financial means to pay any significant penalties.  "The defendant's net worth and corresponding ability to pay has proven to be one of the most important factors that district courts consider when determining how much of a civil penalty to assess in an insider-trading cases."  *SEC v. Perez*, 2011 WL 5597331 at *7 (S.D. Fla. 2011).  "The Court may consider a defendant's ability to pay when determining the amount of civil penalties to impose or whether to waive civil penalties."  *SEC. Druffner*, 802 F. Supp. 2d 293, 298 (D. Mass. 2011).  While this is not an insider-trading case, the court believes a penalty at the low-end of the scale is appropriate because of the Orrs' strained financial condition, the corporate and personal bankruptcies, their personal guarantees, the mortgages on their own personal property, the judgments already against them, the pending lawsuits, and the amount of the disgorgement award.

In the exercise of its equitable discretion to fashion appropriate civil penalties, the court has given weight to the defendants' efforts at stepping into the gap and risking their own money and time to address the unfolding and growing financial crises.  The court does not share the SEC's

cynicism that the defendants were only motivated to save their own wealth tied up in these collapsing companies, for the defendants did not behave as other corporate officers or shareholders did when the handwriting was on the wall.  The defendants have furnished the court with numerous documents demonstrating they stepped forward at the insistence of the respective boards and they assumed leadership roles acting on the advice of different professionals.  And while the defendants did conceal material facts, the court is not equipped with the evidence to make any conclusions on whether this necessarily delayed the collapses or resulted in any specific additional harm. Finally, the court has given significant weight to the defendants' distressed financial conditions and concludes that second-tier penalties are appropriate as to each of them.  After considering all the relevant factors and circumstances, the court finds that civil penalties are appropriate and assesses against Robert Orr a second-tier $3,000 penalty for each of the 16 areas where his conduct violated the securities laws and against Leland Orr a second-tier $2,000 penalty for each of the 10 areas where his conduct violated the securities laws.

IT IS THEREFORE ORDERED that the SEC's motion for final judgment as to disgorgement and penalties (Dk. 30) is granted as hereby framed--Robert D. Orr shall disgorge his ill-gotten gains of $771,147, pay prejudgment interest in the amount of $144,993, and pay a civil penalty in

the total amount of $48,000; and Leland G. Orr shall disgorge his ill-gotten gains of $270,000, pay prejudgment interest in the amount of $50,766, and pay a civil penalty in the total amount of $20,000;

IT IS FURTHER ORDERED that the order (Dk. 47) denying the Orrs' motion for leave to file surreply (Dk. 46) is vacated and the motion for leave to file the attached surreply is granted.

IT IS FURTHER ORDERED that the plaintiff SEC shall furnish the court in ten days with a proposed final judgment of disgorgement, prejudgment interest, and civil penalty consistent with the terms of this order.

Dated this 17th day of April of 2012, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge